Charles COLLIS, Plaintiff,

v.

GWINNETT COUNTY, GEORGIA, Gwinnett County Department of Fire and Emergency Services, Defendants.

No. 1:99–CV–1237–CAM.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 28, 2001.

William Q. Bird, Karin Allen Middleton, William Q. Bird & Associates, Atlanta, GA, for Charles Collis, plaintiff.

Melinda K. Wells, Karen Gilpin Thomas, Scott James Fuller, Gwinnett County Law Department, Lawrenceville, GA, for Gwinnett County, Georgia, Gwinnett County Department of Fire and Emergency Services, defendants.

## ORDER

MOYE, District Judge.

Plaintiff, Charles Collis, filed this case seeking to recover from Defendants, Gwinnett County, Georgia (County), and Gwinnett County Department of Fire and Emergency Services (Department), for alleged violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.* The case is before the Court on Defendants' motion for summary judgment. For the reasons stated herein, the motion is GRANTED.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff has a severe to profound (40%) loss of hearing in each ear, which is corrected by hearing aids. At all times relevant to this case, the County was aware of Plaintiff's impaired hearing and use of hearing aids. The Department was not aware of Plaintiff's impaired hearing and use of aids until after he was hired as a paramedic and placed in the training program.

Plaintiff applied for a position as a Gwinnett County paramedic on February 20, 1996. On May 26, 1996, the County's physician found Plaintiff qualified but "with areas of concern" due to "decreased auditory ability" and noted that Plaintiff had to wear hearing aids. Plaintiff was offered a position by the Department on June 24, 1997, and entered the paramedic training

program on August 23, 1997. Prior to starting work for the County, Plaintiff was employed as a paramedic in Fannin County.

The training program is divided into two phases: Phase I consists of two weeks at the Department training center learning basic job skills such as reading blood pressures and EKG strips, as well as communication codes, patient evaluations, methods of patient care, and departmental philosophy; Phase II consists of six weeks or at least thirteen shifts of field training apprenticeship under the observation of a field training specialist. After each shift an apprentice works, the field training specialist documents his observations and forwards the evaluation to the training coordinator. A paramedic is released for regular assignment when he can safely and consistently perform the essential job functions of a paramedic. Paramedics in the training program receive the same salary and benefits as those on regular assignment.

Plaintiff successfully passed Phase I of the training program and began field training on September 8, 1997. On October 21, 1997, rather than being moved to a regular assignment, Plaintiff was transferred to a different station to continue training under different field training specialists. The decision to continue Plaintiff's training was based not only on the communications problems he was experiencing but also so that he might work on "[patient] assessment[s], leadership skills, ... and his ability to handle a call from its inception to its termination without guidance."

Chief Michael Buice, head of the Department, stated by affidavit, "The ability to consistently alert and react to emergency communications en route to and from emergency scenes in a Med Unit, and at emergency scenes is, inherently, a component of every essential function of the job of a paramedic," because "paramedics are regularly exposed to noisy, dangerous and violent conditions at emergency scenes." While Buice acknowledged that Plaintiff "maintained good relationships with patients, had good treatment skills and developed good treatment plans," and that "it is impossible to expect every paramedic to alert or react to every communication," he added that "[t]he frequency of [Plaintiff's] communication errors was unacceptable job performance."

Plaintiff's progress reports, included as exhibits to Buice's affidavit, show that Plaintiff consistently had problems with communications. They also show, however, that at the end of December 1997, after working with Plaintiff for more than two months, Allen Dalrymple, the field training specialist at the second station to which Plaintiff was assigned, recommended that Plaintiff "be Released from the internship program and sent to his Station assignment." Shortly after he began working with Plaintiff, in November 1997, Dalrymple stated in a letter to Lt. Steven Langlois, coordinator of the apprenticeship training program:

> I have been observing [Plaintiff's] communication skills both with the patients on scene, in the back of the Med unit and at the Hospitals. What I have seen is that even with his Hearing Disability [Plaintiff] is able to function without difficulty in most environments. Like all of us in the field background noise of equipment, sirens, engine noise can be a problem and [Plaintiff] is affected just like the rest of us....
>
> I do have some suggestion[s] that may help with some of the concerns that have been brought up about [Plaintiff].
>
> - To help with the background noise in the front cab of the Med unit I feel that Headphones should be used, we have them in the back for

the Med Radio. This wa[y] the volume can be adjusted and even with the siren and air horns going he would still be able to hear any radio traffic. I also feel that they should do this for all the Med Units.

- Also to assist with the Background noise I would recommend that an Electronic stethoscope be purchased for [Plaintiff] to use.
- Since [Plaintiff] does have a Hearing Disability, the County should provide him with the current state of the art Hearing Aids that would self adjust to the background decibel. This would elevate [sic] any concerns about [h]is Hearing ability.

In November 1997, Plaintiff met with Deputy Chief Howard H. Giles, in charge of the Department's training functions, Dan Roach, Employee Relations Manager, and Langlois to determine what accommodation the County could offer Plaintiff to help him respond more consistently to emergency communications. In December 1997, Plaintiff was asked to see an audiologist at County expense. The audiologist recommended new hearing aids for Plaintiff. In recommending a specific type of hearing aid, the audiologist took into consideration Plaintiff's job requirements, including his communication needs. The aids were purchased by the County, and Plaintiff began wearing them on February 11, 1998. The Department did not provide the headphones recommended by Dalrymple, but there is no evidence that Plaintiff asked that headphones be provided. On April 5, 1998, Plaintiff was again transferred to a different station to continue field training with new specialists rather than being given a regular assignment.

Late in May 1998, Langlois and Giles recommended that Plaintiff be terminated. Throughout his field training, Plaintiff's supervisors' reports indicated not only that Plaintiff had problems with hearing radio communications but also in knowing which radio channel to use for communications and in direct communications with other people. At least one supervisor suggested that Plaintiff's problems occurred because he was not paying close enough attention to the radio. After reviewing all reports of personnel who had observed and reported on Plaintiff's performance, Buice terminated Plaintiff on June 11, 1998. Plaintiff returned to the paramedic position he had previously held in Fannin County and also works part time as a paramedic for Pickens County.

On November 23, 1998, Plaintiff filed a discrimination charge with the EEOC, alleging he "was discriminated against because of [his] disability (40% hearing loss) when [he] was terminated in violation of the [ADA]," and received a Right to Sue Notice on February 18, 1999. He filed his complaint on May 14, 1999, and, on July 29, 1999, an amended complaint. Plaintiff alleged Defendants "regarded [him] as having a disability which substantially limits one or more life activities, despite the fact that the use of his hearing aids corrected [his] hearing disability sufficiently to allow him to perform the essential functions of his job as a paramedic." He further alleged he "is disabled within the meaning of the ADA because [Defendants] regarded [him] as though he had a disability which substantially limited the major life activity of hearing and working in all jobs available"; he "was a qualified individual successfully performing the essential functions of his job"; Defendants' "stated reason for terminating [him] is a pretext" for discrimination; and Defendants failed "to reasonably accommodate [his] disability."

Defendants filed a motion for summary judgment contending Plaintiff failed to

provide sufficient evidence to show a *prima facie* case of discrimination in violation of the ADA. Defendants further contend they provided a legitimate, non-discriminatory reason for Plaintiff's discharge (his failure to consistently react and alert to communications) and that Plaintiff failed to provide evidence that this reason was a pretext for discrimination. Finally, Defendants contend the Department is not a separate entity subject to legal action.

Plaintiff does not dispute that the Department is not a separate entity, but disputes all Defendants' other allegations.

## LEGAL STANDARDS AND ANALYSIS

### I. *Standards for ADA Claims*

The ADA prohibits "certain employers from discriminating against individuals on the basis of their disabilities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 475, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). The term "disability" means, with respect to an individual—

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). "[W]hether a person has a disability under the ADA is an individualized inquiry." *Sutton*, 527 U.S. at 483, 119 S.Ct. 2139. "[I]f a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures—both positive and negative—must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the Act." *Id.* at 481, 119 S.Ct. 2139. Even if an individual cannot state a claim that he is actually "disabled," he may still fall within the act by showing that he is "regarded" as being "disabled" if a covered entity believes either "that [he] has a substantially limiting impairment that [he] does not have or that [he] has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Id.* at 489, 119 S.Ct. 2139.

"When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Id.* at 491, 119 S.Ct. 2139. "To be substantially limited in the major life activity of working ... then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Id.* at 492, 119 S.Ct. 2139.

"A person is 'otherwise qualified' if he or she is able to perform the essential functions of the job in question." *Jackson v. Veterans Admin.*, 22 F.3d 277, 278 (11th Cir.1994) (citing *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)). "The employee must be 'able to meet *all* of a program's requirements in spite of his handicap.'" *Id.* (emphasis added) (citing *Southeastern Community College v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979)). Under the ADA, "employers may justify their use of 'qualification standards ... that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability,' so long as such standards are 'job-related and consistent with business necessity, and ... performance cannot be accomplished by reasonable accommodation....'" *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 568, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999) (quoting 42 U.S.C. § 12113(a) (ellipses in *Albertson's* )).

The ADA "operates to create an affirmative duty for employers to reasonably accommodate individuals with disabilities." *Harris v. H & W Contracting Co.*,

102 F.3d 516, 519 (11th Cir.1996). "In ADA parlance, the word 'discriminate' is defined broadly to include 'not making' reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business.'" *Id.* (citing 42 U.S.C. § 12112(b)(5)(A)). "The burden of identifying an accommodation that would allow a qualified individual to perform the job rests with that individual, as does the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable." *Terrell v. USAir,* 132 F.3d 621, 624 (11th Cir.1998) (quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1286 (11th Cir.1997)). "Whether an accommodation is reasonable depends on specific circumstances." *Id.* at 626. "Once the plaintiff has met her burden of proving that reasonable accommodations exist, the defendant-employer may present evidence that the plaintiff's requested accommodation imposes an undue hardship on the employer." *Id.* at 624.

 "In order to establish a prima facie case under the ADA, [a plaintiff] must show that: (1)[he] has a disability; (2)[he] is a qualified individual; and (3)[he] was discriminated against because of [his] disability." *Id.*

## II. Analysis of Plaintiff's Claims

### A. Whether Plaintiff Has a Disability

Plaintiff contends he has a disability within the meaning of the ADA because Defendants believed he had "a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton,* 527 U.S. at 489, 119 S.Ct. 2139. Defendants contend Plaintiff does not have a disability within the meaning of the ADA because his hearing was, in fact, impaired,

as he himself admitted, and "Defendants' belief that Plaintiff was substantially limited in his ability to hear was not a mistake."

 The evidence before the Court shows: (1) Plaintiff consistently failed to alert and react to emergency radio communications; (2) Plaintiff sometimes failed to respond to communications from co-workers, patients, patients' family members, by-standers, and hospital personnel; (3) although problems with background noise occasionally affected the ability of most paramedics to alert and react to emergency communications, Plaintiff consistently had more problems than others; and (4) Plaintiff continued to have significant problems even after he was provided with new hearing aids. Defendants' belief that Plaintiff was substantially limited in his ability to hear was based on his performance during training, and there is no evidence that Plaintiff was judged differently than any other paramedic in the training program. Plaintiff failed to show that Defendants considered Plaintiff's hearing to be more impaired than it was.

Plaintiff further contends he has a disability within the meaning of the ADA because defendants believed he was substantially limited in his ability to work. Defendants contend Plaintiff has shown, at most, that Defendants believed him unable to perform the job of paramedic.

The only job Plaintiff sought from Defendants was that of paramedic. Nothing in the evidence suggests that Defendants considered him unable to perform any other job. Plaintiff failed to show that Defendants considered him substantially limited in his ability to work.

Plaintiff has failed to show that he is disabled within the meaning of the ADA.

B. *Whether Plaintiff Was a Qualified Individual*

Plaintiff contends he was a qualified individual because, although he occasionally missed some communications with other paramedics, he was able to perform the essential functions of the job. He further contends that there is no evidence that, during his nine months of being employed by Defendants, he compromised the safety of another person. Finally, he contends Defendants failed to provide reasonable accommodations for the disability they perceived him to have in that they did not provide the headphones recommended by his training supervisor.

Defendants contend Plaintiff was not qualified because he was not able to consistently alert and react to emergency communications and that this inability caused a direct threat to the health and safety of himself and others. They further contend they had no obligation to accommodate Plaintiff's "perceived disability." Finally, Defendants contend they provided reasonable accommodation by extending Plaintiff's training and sending him to an audiologist and purchasing for him the new hearing aids recommended by the audiologist.

■ The evidence before the Court shows that, although he had good treatment skills, Plaintiff failed to alert and react to emergency communications, a necessary part of being a paramedic. Plaintiff did not compromise the safety of others because he was continually under the supervision of a field training specialist after completing Phase I of the training program. Plaintiff had difficulty not only with radio communications, but with direct communications with other people. Defendants sent Plaintiff to an audiologist, provided him with new hearing aids, and repeatedly extended his probationary period to provide him additional time to adjust both to the environment and to the new

hearing aids. Although Defendants did not provide headphones in the front of Plaintiff's Med Unit as recommended by Dalrymple, Plaintiff failed to show that he requested headphones as an accommodation. Additionally, the Court notes that while headphones might have helped with radio communications in the front of the Med Unit, they would not have helped while he was on the scene of an emergency, which Plaintiff's training supervisors also noted as a problem. Plaintiff failed to show that he was qualified for the job of paramedic in Gwinnett County or that Defendants failed to provide reasonable accommodation for his disability.

C. *Whether Defendants Articulated a Legitimate Non-discriminatory Reason for Their Action*

■ Defendants contend they discharged Plaintiff because he could not consistently and reliably alert or react to emergency communications. Plaintiff contends this is not a legitimate non-discriminatory reason because there is nothing in the evidence to indicate that a paramedic had to consistently and reliably respond to all communications to perform the essential functions of the job.

The Court finds that Defendants have met their burden of articulating a legitimate, non-discriminatory reason for discharging Plaintiff.

D. *Whether Plaintiff Can Show that the Stated Reason Is a Pretext for Discrimination*

Plaintiff contends he was able to effectively perform the job of paramedic despite occasionally missing radio communications and that several of his field training supervisors recommended that he be placed in a permanent position. He further contends that perfect communication was not an essential element of

the job of paramedic because other paramedics missed calls and were not disciplined for it.

Defendants contend no other paramedic consistently failed to alert or react to emergency communications, as did Plaintiff. They further contend that their knowledge of Plaintiff's hearing loss prior to hiring him and their efforts to accommodate him show the absence of pretext.

■ Plaintiff failed to provide evidence of similarly situated paramedics who were treated more leniently than he. *See Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989) (holding that the plaintiff must provide evidence that the misconduct for which he was discharged was nearly identical to that engaged in by other employees who were retained). Moreover, the evidence before the Court shows that Plaintiff consistently had problems with emergency communications and that proper radio communications was an essential part of the job of paramedic. Plaintiff failed to provide sufficient evidence to show that Defendants' stated non-discriminatory reason for terminating his employment was a pretext for discrimination.

## CONCLUSION

For the reasons stated herein, the Court GRANTS Defendants' motion for summary judgment [14–1].

Clerk of Court is directed to enter judgment for Defendants. This closes the case.

SO ORDERED.